Abbas ASSAR, M.D., Plaintiff–Appellant,

v.

CRESCENT COUNTIES FOUNDATION FOR MEDICAL CARE and Central Illinois Medical Review Organization (CIMRO), Defendants–Appellees.

No. 92–3678.

United States Court of Appeals, Seventh Circuit.

Argued May 12, 1993.

Decided Dec. 29, 1993.

Rehearing Denied March 9, 1994.

Thomas J. Pliura, LeRoy, IL (argued), for Abbas Assar, M.D.

Priscilla P. Weaver (argued), Suzanne D. Rubens, Peter John Donoghue, Mayer, Brown & Platt, Chicago, IL, for Crescent Counties Foundation For Medical Care.

Gail A. Omahana, Robert A. Bower, Vern J. Holzhall (argued), Landau, Omahana & Kopka, Chicago, IL, for Central Illinois Medical Review Organization (CIMRO).

Before BAUER, KANNE and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Crescent Counties Foundation for Medical Care ("CCFMC") is a peer review organization ("PRO") under contract with the Health Care Financing Administration ("HCFA") to review the medical care provided by physicians and hospitals participating in the Medicare program. See 42 U.S.C. § 1320c et seq.[1] Central Illinois Medical Review Organization ("CIMRO"), also a PRO, subcontracts with CCFMC to perform peer review services for HCFA.[2] Dr. Abbas Assar seeks damages from CCFMC and CIMRO, alleging that CIMRO failed to follow proper statutory and regulatory procedures when it found him in violation of certain quality of care requirements. The district court dismissed the suit for lack of subject matter jurisdiction, and we affirm.[3]

1. Because CIMRO made the now-contested finding regarding Assar in August 1989, we will rely on the 1988 statute and regulations, which were in effect at that time.

2. 42 U.S.C. § 1320c–2(c)(1) authorizes such subcontracting.

3. Although some courts as well as the parties and the district court in this case have framed the issue as one of subject matter jurisdiction, other courts have understood it as failure to state a claim. Because the result is the same either way, the distinction is not significant.

### I. Background

Health care providers who participate in the Medicare program are statutorily required to "assure" that their services:

> (1) will be provided economically and only when, and to the extent, medically necessary;
>
> (2) will be of a quality which meets professionally recognized standards of health care; and
>
> (3) will be supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by a reviewing peer review organization in the exercise of its duties and responsibilities.

42 U.S.C. § 1320c–5(a); *see also* 42 C.F.R. § 1004.10. PROs review the services of participating providers to insure compliance with these statutory obligations. Possible sanctions for non-compliance include exclusion from the Medicare program. 42 U.S.C. § 1320c–5(b)(1); 42 C.F.R. § 1004.20; *see also* 42 U.S.C. § 1320c–2(c)(1).

The statute and regulations set out an elaborate procedure for finding non-compliance. *See* 42 U.S.C. § 1320c–5; 42 C.F.R. §§ 1004.30–1004.80. That process is set into motion when the PRO determines that a provider either has "failed in a substantial number of cases substantially to comply" with the statutory obligations or has "grossly and flagrantly violated any such obligation in one or more instances." 42 U.S.C. § 1320c–5(b)(1); *see also* 42 C.F.R. § 1004.30(c). Upon making that determination, the PRO must notify the provider in writing of both the basis for the determination and the proposed sanction. The provider then has thirty days to submit additional information or to request a meeting to discuss the PRO's de-

termination (42 C.F.R. § 1004.50),[4] and the PRO may reconsider its decision in light of any additional information (42 C.F.R. § 1004.50(c)). If the PRO persists in its determination, it must submit a report and recommendation to the Office of the Inspector General ("OIG") (42 C.F.R. §§ 1004.60–1004.80) and must send the provider a copy of its report (42 C.F.R. § 1004.60(b)). The provider once again has thirty days to submit additional information, this time to OIG. 42 C.F.R. § 1004.60(b)(2). OIG then reviews the determination and recommended sanction (42 C.F.R. § 1004.90) and notifies both the provider and the public of its decision (42 C.F.R. § 1004.100). Finally, the regulations provide:

> The determination and notice of sanction provided for in this section constitute an "initial determination" and a "notice of initial determination" for purposes of the administrative appeals procedures specified in Part 498 of this title concerning determinations and appeals procedures for providers and suppliers.

42 C.F.R. § 1004.100(g).

Part 498 in turn sets out a procedure for administrative review. First, the provider may request reconsideration by HCFA. 42 C.F.R. § 498.22. He may then request a hearing before an administrative law judge (42 C.F.R. §§ 498.40–498.78), whose decision is subject to review by an Appeals Council (42 C.F.R. § 498.80–95). After completing the administrative review process, the provider may file a civil action in federal district court pursuant to 42 U.S.C. § 405(g). 42 U.S.C. § 1320c–5(b)(4); 42 C.F.R. § 498.103.

Between 1986 and 1991, CIMRO reviewed the medical services Assar provided to Medicare beneficiaries.[5] In August 1989, CIMRO

---

**4.** When the PRO finds a "substantial violation in a substantial number of cases," the regulations outline an additional procedure, which includes sending a "written *initial* notice of the identification of a violation." 42 C.F.R. § 1004.40(b) (emphasis added). That notice must indicate the proposed sanction and must give the provider twenty days to submit additional information or request a meeting to discuss the determination. 42 C.F.R. §§ 1004.40(b)(5) & (6). The notice might also include, at the PRO's discretion, a suggestion for corrective action. 42 C.F.R. § 1004.40(b)(4). The 1988 regulations did not

provide for corrective action in the case of "gross and flagrant" violations. Pursuant to a 1992 amendment, 42 C.F.R. § 1004.50(b)(4) now directs the PRO to suggest corrective action, "if appropriate," for either a "substantial" or a "gross and flagrant" violation.

**5.** This factual summary derives from Assar's First Amended Complaint ("Complaint"). We adopt his version of the facts in considering defendants' motion to dismiss.

found that Assar had committed a gross and flagrant violation[6] and as a result required him to obtain a second opinion before performing any non-emergency surgery. (Complaint at Count I ¶¶ 7, 13). CIMRO, however, did not provide Assar with written notice as required by 42 C.F.R. § 1004.50 and did not submit a report to OIG as required by 42 C.F.R. § 1004.70. The latter failure, according to Assar, prevented the administrative review process from going forward.[7] He thus claims that CIMRO "constructively and effectively prevented him from appealing its decisions either through administrative review or judicial review." (Complaint at Count I ¶ 14). He also claims that CIMRO acted beyond its authority when it imposed "practice restrictions" (*id.* at Count I ¶ 12; *see supra* n. 7) and that CIMRO published false and defamatory statements about him in violation of 42 U.S.C. § 1320c–9[8] and 42 C.F.R. §§ 476.107 & 476.139. (Complaint at Count 1 ¶ 10). Assar asserts that he "has exhausted all administrative appeal remedies by sending multiple requests to CIMRO and its attorney as well as the Department of Health and Human Services, Health Care Financing Administration … requesting appeals, hearings, and reviews of the illegal PRO actions … which were subsequently denied…." (*Id.* at Count 1 ¶ 15).

6. The violation related to an elderly patient, whose death CIMRO's report attributed to inappropriate emergency room care. According to the report, Assar may have been at least partially responsible for that care. The report also includes several additional less serious violations. (Complaint Ex. 1 at 3).

7. The defendants assert that CIMRO did not follow these steps because Assar had agreed to participate in a corrective action plan (receiving the second surgical opinions) in order to avoid being excluded from the Medicare program. They claim that if Assar had not agreed to participate in the corrective action plan, the report and recommendation would have been sent to OIG and the administrative review process would thereby have been set into motion. Assar argues that the PRO had no authority to institute a corrective action plan because the 1988 regulation did not provide that option for "gross and flagrant" violations. Defendants respond that despite the absence of regulatory authorization, HCFA's policy was to allow corrective action plans for "gross and flagrant violations" even before the regulation was amended. (*See* Complaint Ex. 6 at 2). This dispute is irrelevant for purposes of defendants' motion to dismiss, as to

All parties agree that there was no final administrative decision here that would have been reviewable in federal district court under 42 U.S.C. § 405(g). Instead, Counts I and II of Assar's complaint purport to arise "under Part B of Title XI and Title XVIII as well as other parts of the Social Security Act" and do not assert any other basis for federal jurisdiction. (Complaint at Count I ¶ 1, Count II ¶ 1). Count III asserts a Fifth Amendment due process claim and cites 28 U.S.C. § 1331 as the basis for federal jurisdiction. All three counts seek compensatory and punitive damages.

## II. Counts I and II

■ The basis for the first two counts of Assar's complaint is not immediately apparent. The Social Security Act contains no provision expressly authorizing damages actions against PROs, and Assar's complaint does not cite any particular provision as giving rise to such an action. Be that as it may, the district court did not directly address the basis for Counts I and II, but focused only on Assar's Count III due process claim.[9] Assar did not contest the court's decision in a post-judgment motion and has addressed only the constitutional claim on appeal.[10] Having

which we must make all factual inferences in Assar's favor.

8. 42 U.S.C. § 1320c–9(a) provides that "[a]ny data or information acquired by any [PRO] in the exercise of its duties and functions shall be held in confidence and shall not be disclosed to any person …," with various enumerated exceptions related to the Act's purpose. Subpart (c) of the section provides that "any person violating the provisions of this section shall, upon conviction, be fined not more than $1,000, and imprisoned for not more than 6 months…."

9. After concluding that no remedy was available for the alleged due process violation, the district court stated, "there is no other basis for federal jurisdiction either alleged or available." *Assar v. Crescent Counties Found.*, No. 92–2161, slip op. at 7, 1992 WL 560908 (C.D.Ill. Oct. 6, 1992).

10. Assar's jurisdictional statement on appeal states, "[t]his case arises under the Constitution and, therefore, the District Court had jurisdiction under 28 U.S.C. § 1331." He does not articulate any theory under which the Social Security Act itself might give rise to a private damages action.

failed to challenge the dismissal of Counts I and II on appeal, Assar has apparently acquiesced in the district court's implicit decision that these counts stated no viable cause of action.

### III. Count III

■ Assar attempts to rest Count III on the Fifth Amendment, relying on the theory first articulated in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). There, the Supreme Court held that individuals whose Fourth Amendment rights had been violated by federal officers could sue for money damages in federal court. The Court found "no special factors counselling hesitation in the absence of affirmative action by Congress" (*id.* at 396, 91 S.Ct. at 2005) and noted the absence of any "explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress" (*id.* at 397, 91 S.Ct. at 2005). *See also Davis v. Passman*, 442 U.S. 228, 246–47, 99 S.Ct. 2264, 2277–78, 60 L.Ed.2d 846 (1979).

In *Bush v. Lucas*, 462 U.S. 367, 378, 103 S.Ct. 2404, 2411, 76 L.Ed.2d 648 (1983), the Court summarized the considerations that are relevant in determining whether damages are available for constitutional violations by federal actors:

> When Congress provides an alternative remedy, it may of course, indicate its intent, by statutory language, by clear legislative history, or perhaps even by the statutory remedy itself, that the courts' power should not be exercised. In the absence of such a congressional directive, the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation.

In *Bush*, a federal civil servant who alleged that he had been wrongfully discharged in retaliation for exercising his first amendment rights sued for damages. Although the Court noted that Congress had neither expressly precluded a damages remedy nor provided an equally effective alternative (*id.*), it nonetheless found "special factors counselling hesitation." The Court concluded that "special factors" related to "the question of who should decide whether such a remedy should be provided" (*id.* at 380) and, in light of the administrative review process that was already in place, explained:

> The question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue. That question obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff.

*Id.* at 388, 103 S.Ct. at 2416–17. Finding ultimately that "Congress is in a better position to decide whether or not the public interest would be served by creating" a damages remedy, the Court declined to do so. *Id.* at 390, 103 S.Ct. at 2417.

In *Schweiker v. Chilicky*, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), the Court explored *Bivens* and its progeny in a context very similar to our own. Plaintiffs who had been denied social security benefits sought damages for alleged due process violations. Summarizing its own post-*Bivens* case law, the Court explained:

> [T]he concept of "special factors counselling hesitation in the absence of affirmative action by Congress" has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent. When the design of a Government program suggests that Congress has provided what it considers ade-

---

Perhaps he means to do so when he cites 42 U.S.C. § 1320c–6 (*see* Assar brief at 16–20), but he has failed to explain how this provision—which appears to do nothing more than bar or

limit civil or criminal liability of various individuals or entities under certain circumstances— would *give rise to* a federal cause of action.

quate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.

*Id.* at 423, 108 S.Ct. at 2468. The Court noted that the Social Security Act provided for several levels of administrative review and for subsequent judicial review, which would include review of constitutional claims, under 42 U.S.C. §§ 405(g) & 421(d). Although that process did not offer complete relief—damages for constitutional violations were unavailable—the Court found that Congress "has not failed to provide meaningful safeguards or remedies for the rights of persons situated as respondents were." *Id.* at 425, 108 S.Ct. at 2468. It further reasoned that "[i]n light of the comprehensive statutory scheme[ ] involved, the harm resulting from the alleged constitutional violation can[not] be separated from the harm resulting from the denial of the statutory right." *Id.* at 428, 108 S.Ct. at 2470. The Court thus concluded:

> Whether or not we believe that its response was the best response, Congress is the body charged with making the inevitable compromises required in the design of a massive and complex welfare benefits program. Congress has discharged that responsibility to the extent that it affects the case before us, and we see no legal basis that would allow us to revise its decision.

*Id.* at 429, 108 S.Ct. at 2470–71 (citations omitted).

Relying on *Chilicky,* the Tenth Circuit in *Hilst v. Bowen,* 874 F.2d 725 (10th Cir.1989) (per curiam), dismissed a complaint very similar to Assar's. In that case, a physician sought damages for due process violations that allegedly had occurred when he was suspended from the Medicare program for falsifying claim forms and providing unnecessary services. Although administrative review ultimately cleared him of those charges,

Hilst claimed that he should have been reinstated in the program during the pendency of his appeal. The court did not allow his *Bivens* action, reasoning:

> In this case, a comprehensive remedy is provided to physicians when their right to participate in the Medicare program is suspended. As in *Chilicky,* this remedy includes an elaborate administrative hearing, and administrative and judicial review. Although this remedial framework does not provide Hilst with consequential damages arising from defendant's unconstitutional conduct, the Court in *Chilicky* clearly indicated that this lack does not entitle a plaintiff to maintain a *Bivens* action so long as the remedy, although incomplete, is adequate and the safeguards are meaningful. We believe that the reasoning of *Chilicky* is applicable here and precludes Hilst from pursuing a *Bivens* action.

*Id.* at 727–28 (citations omitted).

As was true in *Chilicky* and *Hilst,* Congress has created a comprehensive scheme by which physicians can obtain review of PRO decisions affecting their participation in the Medicare program. As in those cases, the harm resulting from the alleged constitutional violation is indistinguishable from the harm resulting from the denial of the statutory right. The fact that the particular remedy Assar seeks is unavailable under the existing framework does not justify creation of a *Bivens* remedy. *See Feit v. Ward,* 886 F.2d 848, 854 (7th Cir.1989).

Assar argues that his case is distinguishable from *Chilicky* and *Hilst* because CIM-RO prevented his participation in the remedial scheme that was available by failing to submit a report and recommendation to OIG.[11] But our decision today addresses only the availability of a *damages* remedy, which is the sole relief that Assar has requested. He has not sought to compel CIM-RO's compliance with the regulations.[12]

11. As already noted, the defendants dispute Assar's factual assertions (*see* n. 7), but that factual dispute is irrelevant for our purposes.

12. He might, for example, have sought relief under 28 U.S.C. § 1361, the federal mandamus statute, which provides:

> The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

Although we are not now asked to decide whether such relief is available in these circumstances,

### IV. Conclusion

No *Bivens* remedy is available to Assar in light of the comprehensive remedial scheme set forth in the statute and regulations. The district court's dismissal of Assar's complaint is AFFIRMED.

we did hold in *Burnett v. Bowen*, 830 F.2d 731, 738 (7th Cir.1987), that "Congress intended to preserve mandamus jurisdiction for claims that are procedural in nature under the Social Security Act." Assar seems to acknowledge the avail-

ability of mandamus relief when he states that "28 U.S.C. § 1361 is not the exclusive or mandatory avenue by which Plaintiff must pursue claims against the PRO." (Assar Brief at 13).