Filed 8/21/14  P. v. Barrientos CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ENCARNACION BARRIENTOS,<br><br>    Defendant and Appellant. | F065845<br><br>(Kern Super. Ct. No. BF137677A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Cruz Martinez (a.k.a. "Bam-Bam"), a gang member, was a passenger in a vehicle when it drove by defendant and Vicente Perez, also both gang members.  Martinez yelled

at defendant and Perez from the vehicle. Defendant approached the vehicle and Martinez eventually brandished a gun, pointed it at defendant, and pulled the trigger. The gun did not fire.

The gang to which Martinez belonged was the South Side Bakers. The South Side Bakers are a subset of the larger Sureño gang. As it turns out, defendant was also a member of the Sureño gang.

Later that day, defendant called a "meeting" at a residence and directed that Martinez arrive unarmed. The meeting took place, though the details of what occurred are unclear. However, it is undisputed that defendant eventually stabbed Martinez. Defendant claimed that Martinez "came at" him first and that he had acted in self-defense. Martinez eventually died from the stab wound.

At defendant's trial, evidence that other gang members pled guilty to charges arising from this incident was admitted. Defendant challenges the admission of that as violative of Evidence Code section 352 and *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). We hold that the admission of this evidence was prejudicial error and reverse the judgment.

Defendant also submits the court committed instructional error. We will address that claim to provide guidance on remand. (See Code Civ. Proc., § 43.)

One of the prosecution's theories was that "the defendant originally intended to aid and abet assault" at the meeting and that the murder occurred as a natural and probable consequence of that assault. Accordingly, the court instructed the jury on this theory, known as the natural and probable consequences doctrine. This doctrine permits, under certain circumstances, the conviction of an aider and abettor for crimes they did not intend for the perpetrator to commit. Consequently, the court instructed the jury: "If you decide that the defendant aided and abetted the assault and that murder was a natural and probable consequence of that crime, the defendant is guilty of murder."

2.

Defendant challenges the propriety of this instruction because he was the perpetrator of the murder rather than an aider and abettor. We hold that the natural and probable consequences doctrine does not apply to the perpetrator of a nontarget offense. Therefore, the trial court erred in instructing the jury on the doctrine when there was no evidence that anyone other than defendant was the perpetrator of the nontarget offense.

## BACKGROUND

The Kern County District Attorney's office charged Luis Montenegro III, Vicente Adam Perez and defendant Encarnacion Barrientos with several felonies. Count I charged the trio with premeditated and deliberated murder (Pen. Code, §§ 187, subd. (a), 189)[1] for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)), with the special circumstance of a gang-related killing (§ 190.2, subd. (a)(22)). Count II charged active participation in a criminal street gang. (§ 186.22, subd. (a).) The information also alleged defendant had suffered a prior prison term (§ 667.5, subd. (b)) and serious felony conviction (§ 667, subd. (a)).

An Adam Velasquez was also charged with murder (§ 187, subd. (a)), and participation in a criminal street gang (§ 186.22, subd. (a).)

Perez, Velasquez and Montenegro eventually pled no contest to assault. (§ 245, subd. (a)(4).) Defendant, however, proceeded to trial, at which a jury convicted him of second degree murder and participation in a criminal street gang. The jury also found that defendant committed the second degree murder for the benefit of a criminal street gang. (§ 186.22, subd. (B)(1).) The court found the prior conviction and prison term allegations true.

Defendant moved for a new trial on several bases, including his claim that the court erred in admitting evidence of the codefendants' plea bargains. The court denied

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

3.

the motion and sentenced defendant to a prison term of 30 years to life on count I, plus five years for the prior serious felony. On count II, the court imposed and stayed (§ 654) a sentence of six years, plus five years for the prior serious felony.

# TRIAL EVIDENCE

*Testimony of Cesar Dorado*

Cesar Dorado (a.k.a. "Cisco"), an admitted member of the South Side Bakers gang, testified under a grant of immunity from prosecution. Dorado was "jumped in"[2] to the South Side Bakers when he was a teenager. He believes South Side Bakers are part of the larger Sureño criminal street gang.

On November 15, 2010, Dorado was in his mother's PT Cruiser along with two females and two fellow South Side Bakers: Martinez (the eventual victim) and Joseph Ramirez (a.k.a. "Tall Boy.") Ramirez was driving the vehicle when they passed defendant and Vicente Perez (a.k.a. "Worm") walking in or near the street. Martinez screamed "South" at defendant and flashed a gang sign at defendant (referred to as throwing up the "S.") After the vehicle passed defendant, Martinez was "angry" and said, "[G]o back, see what they said." Ramirez turned the vehicle around and pulled up to defendant and Perez. Defendant and Perez were in the street moving towards the car on the passenger side. Martinez opened the door and pointed a gun at defendant's face. Martinez attempted to pull the trigger, but the gun "was on safety." Martinez backed up, got back into the car, and told Ramirez to "hurry up and go." Based on the way Martinez had acted, Dorado believed he was "on" methamphetamine.

The five individuals in the PT Cruiser, including Dorado, then went to a friend's house about five minutes away. Dorado eventually left that friend's house and went to another friend's house. The other four individuals remained at the first friend's house.

---

[2] Dorado was "jumped in" when he was hit for about one minute by four people.

4.

Ramirez told Dorado to return to the first house where he, Martinez, and two females were. Dorado learned that defendant had "called a meeting" at a house located at 909 Meredith. Dorado was not told the purpose of the meeting. Ramirez told Dorado that "part of the deal with" defendant was that no one was allowed to bring weapons to the meeting. Dorado complied with this directive.

The meeting was to occur at a home located at 909 Meredith. The situation made Dorado nervous, and he thought the meeting was "not a good idea" as he approached the house.

Dorado was accompanied at the meeting by Ramirez, Martinez, and another South Side Baker named Alberto Rodriguez (a.k.a. "Bobo.") They entered the home and went into a back bedroom. After they entered the bedroom, someone closed the bedroom door. In addition to Dorado, Rodriguez, Martinez and Ramirez, there were at least[3] three others in the room, including defendant and Luis Montenegro (a.k.a. "Playboy"), who were both seated. Other people were standing near a sliding door that led outside. Some of the people in the room were not South Side Bakers.

Martinez asked Ramirez what they were all doing there. Ramirez and Perez went outside, exiting through the sliding glass door. Defendant began talking "face to face" with Martinez. Defendant told Martinez that "he had the keys to the city" or something "like that."[4] Defendant then told Martinez that "because we are [S]urenos, we are not supposed to do what he had did [*sic*] earlier that day." Martinez said he did not know that "rule" because he had never been to prison. Dorado also heard Martinez "kind of

---

[3] Dorado initially testified that, in addition to himself and his three companions, there were three additional people in the room. He later testified that there were more than three or four additional people in the room.

[4] Initially, Dorado said he could not hear what defendant was saying. Later, Dorado testified as to certain statements defendant made to Martinez as set forth above.

screaming"[5] that "he was a South Sider but he wasn't a Sureno." Dorado was angry at Martinez for saying that because it was disrespectful to Sureños like himself and the others in the room. Rodriguez said, "What do you mean you are not a [S]ureno?" Martinez said, "Well, I ain't never gone to prison so I don't really know about that." Rodriguez said it was disrespectful for Martinez to deny being a Sureño.

Dorado made his way to the other side of the room. He could see the interaction between Martinez and defendant but could not hear what they were saying. At some point, defendant got up from the chair in which he was sitting. His back was towards Martinez. Martinez then "ran at" defendant and took "a couple" swings at him.[6] Defendant took one swing at Martinez. Martinez ran out of the room. Dorado, eventually the last one in the room, also ran[7] out through the sliding door.

Someone wearing a red shirt attacked Dorado from the side as he was leaving the room. Three others, including Montenegro, joined in attacking Dorado by kicking him. Dorado fell several times but was eventually able to run down an alley. At some point, while Dorado was running, he heard "the click of a gun." He jumped over a fence into a backyard and cut his finger in the process.

At some point, Dorado saw Montenegro and other unidentified individuals chasing Martinez. Dorado saw "them" surround Martinez in an alley, but did not see what happened because Dorado jumped the fence. On cross-examination, Dorado testified he

---

[5] Dorado later testified that Martinez spoke loudly "like kind of like screaming but not screaming."

[6] At one point, Dorado said Martinez "hit" defendant. Later, Dorado said he did not see whether Martinez "connected" on his swings at defendant.

[7] Dorado's subsequent testimony was less clear regarding whether he ran outside. He testified: "I was running. Well, not running, but kind of like trying to get out of there."

6.

saw people surrounding "somebody," who he "would have thought" was Martinez. But he said he did not actually see Martinez in the alley.

Later that day, Dorado spoke with Ramirez who "told him what happened to Bam." Ramirez told Dorado that they, along with Rodriguez, were supposed to have "jump[ed]" Martinez at the meeting after defendant had left the meeting room. This was the first time Dorado heard of the plan. Ramirez had known of the plan to jump Martinez before the meeting occurred.

*Martinez's Final Moments and Death*

On November 15, 2010, Rosemary England was cleaning a home at 1001 Meredith when she heard "obnoxious" banging on the front door. Initially, she did not hear anyone speak. The banging continued for "at least" five minutes when England finally asked who it was. Initially, she did not hear a response. A few second later, she heard, "Help me. Please help me." England went to the back door to make sure it was locked. The knocking stopped. England went back to the front of the house and peered out the window. She saw a man lying down and bleeding. She called 911.

The responding paramedic was dispatched at 11:46 a.m. He determined that the victim had suffered a stab wound, which impacted his subclavian artery. Because the victim had suffered a traumatic injury and there was "no rhythm on the cardiac monitor," the paramedic declared him dead at the scene. The paramedic "did not note any other injuries" to the victim's body other than the stab wound.

The responding police officer saw the victim and immediately recognized him from previous contacts as Martinez.

*Testimony of Alberto Ponce Rodriguez, Jr.*

Rodriguez testified he was formerly a member of the Southside Bakers gang, but claimed he was no longer a member. He also testified that Southside Bakers were "a subset or part of" the Sureño gang.

7.

On the morning of November 15, 2010, Ramirez came to the motel where Rodriguez was staying and woke him up. The night before, Rodriguez had used less than half a gram of methamphetamine. Ramirez said he needed Rodriguez to come with him, but did not explain why or where they were headed. They went to a friend's house on Vine Street. On the way, Ramirez explained that Martinez needed to apologize to "somebody." Ramirez said that earlier that morning Martinez had opened a car door "and it hit somebody." When Rodriguez arrived, Martinez was also at the house on Vine Street. Rodriguez told Martinez to just apologize and "get it over with." At some point, Martinez and Rodriguez began arguing.

Eventually, Rodriguez left the Vine Street house and began walking back to his motel. Rodriguez had been walking for about 10 minutes before Ramirez and Martinez came and picked him up. Eventually, they picked up Dorado as well.[8] They all went to the house on Meredith at "about" 9:00 or 9:30 in the morning.

When they arrived at the Meredith address, they were led into a back room. The door was shut behind them. There were "approximately five other guys" already in the room. Two of the men were seated, three were standing. Martinez shook the hand of one of the men sitting down. Martinez began speaking, but Rodriguez was not paying attention to what was being said. Rodriguez did not hear any arguing. Ramirez left the room with someone Rodriguez did not recognize. About 10 seconds later, Rodriguez went outside through the sliding glass door and walked towards Ramirez. After Rodriguez had taken a few steps, he heard a "commotion." It "sounded like somebody was fighting," and people were "getting loud." Rodriguez saw someone pull a gun with a black handle out of his pocket. Later, Rodriguez testified that he did not know what the person was pulling out of his pants and did not actually see a gun. Rodriguez did not

---

[8] The testimony is unclear regarding whether Ramirez picked up Dorado or Rodriguez first. Either way, this chronology is not dispositive.

know who the armed individual was, but it was not Ramirez, Martinez or Dorado. Rodriguez heard a "clicking from a gun" and began to run. He and Ramirez ran together down a nearby alley. A car passed them as they were running.

Eventually Ramirez and Rodriguez split up, and Rodriguez made it to a friend's house.

*Franky Lee Jones, Jr.*

Franky Lee Jones, Jr., testified at trial, while in custody. In September 2011, Jones had entered into a plea bargain on charges of armed robbery and "possession for sale." The plea bargain called for a sentence of no more than seven years four months in state prison "at 85 percent." The maximum exposure Jones faced on the charges was 25 to 30 years. Jones was released on his own recognizance pending sentencing. He did not appear for sentencing, and was subsequently arrested for theft, possession of a stolen vehicle and possession of a firearm. When asked about whether he was arrested on any other charges, Jones replied: "I think burglary tools or something." In exchange for his testimony at defendant's trial, Jones received a "16-month deal" on the second set of charges. He is now aware that those charges could have carried a sentence of at least 25 years to life without the deal.

A few days after entering into the initial September 2011 plea bargain, Jones contacted the district attorney's office with information regarding Montenegro, who was his former cellmate.

Jones testified that Montenegro had told him the following: Montenegro, a member of the Varrio gang, called Ramirez to set up a meeting to "check" Martinez for pulling a gun on Perez and defendant. Martinez was to be brought to 909 Meredith so that Montenegro and others could "put hands on him." When Martinez arrived, Montenegro said, "You ain't a [S]ureno or what?" Martinez said, "No, I run the

9.

Southside."[9]  They "had words" and Ramirez pushed Martinez.  Then, Martinez and defendant "got in to it."

Jones also testified about why he did not appear at his December 2011 sentencing. He said that he had been scared for his life and "took off."  Jones explained that two Varrio gang members named "Youngster" and "Sneaky" had pulled up to Jones's home. Jones knew the two gang members because he had purchased drugs from them in the past.  Youngster had a gun and told Jones to get into the car.  They took Jones to Sneaky's house.  They told Jones that it would be "not smart" to testify against Playboy. Jones gave them his word that he would not testify, so they let him go.  Jones went back home for his wife and "split."  Jones admitted that, before he was rearrested, he did not tell the district attorney's office about the incident with Sneaky and Youngster.

Jones said he would probably "get whacked" (i.e., "[s]tabbed, killed") for testifying at defendant's trial.  More recently, while Jones was in custody, Montenegro told him "they are waiting" for him at Wasco; that he "signed" his "death wish [*sic*]"; and that he was "pretty much a dead man walking."

*Jamie Perez's Testimony*

Jamie Perez is the sister of Vincente Perez.  On November 15, 2010, Jamie[10] lived at 909 Meredith with her mother, Wanda Steele (a.k.a. Jeanette).  Perez also lived with them, "but he would really never be there."  Jamie initially testified that Perez lives two lives:  one with his kids and one is his "gang life."  She then said Perez "really doesn't have a gang life."

---

[9] At another point in his testimony, Jones recounted Martinez's response slightly differently as:  "No, I am a Southsider."

[10] Because Jamie and Vincent share last names, we will refer to Jamie by her first name.

On the morning of November 15, 2010, Montenegro, Perez and Adam Velasquez (a.k.a. "Mumbles") were present at the 909 Meredith residence. Defendant was also at the residence that day. She heard the "group" talking about how some people had pulled a gun on Perez and defendant. At one point, she heard Montenegro talking on the phone with someone saying "there is to be no weapons."

The "Southsiders" arrived and went into a back room. Jamie did not go into the back room. However, she heard various statements made inside the room. She heard Martinez say, "I run the Southside and this is how it's going to go." Defendant responded by saying, "What do you mean you run the Southside?" Martinez said, "I run the Southside but I'm not a [S]ureno." Montenegro then said, "What do you mean you are not a [S]ureno [?]" Defendant then said, "What do you mean he's not a [S]ureno?" Then, Martinez kept talking.[11] At one point, Rodriguez said that he was from the Southside and was a Sureño.

Ramirez and Perez had exited the back room and were standing in the backyard. They shook hands, then raised their shirts and spun around to show they did not have weapons.

After everyone had been in the back room for about five to 10 minutes, Jamie saw everyone run out of the room. Once she saw everyone running, she "assume[d] something happened." She ran through the house, kicked down the door to the back bedroom and ran to the nearby alley. Jamie testified that Rodriguez left the room first, then Martinez, then Montenegro, then defendant, then Velasquez and his unidentified friend, then an unidentified person who had come with Martinez, Ramirez and Rodriguez. As Martinez ran out of the room, Jamie heard him screaming, "Southside,

---

[11] Initially, Jamie testified that Martinez kept talking and "nobody else was talking." Later, she testified that Rodriguez did speak at this time.

11.

locs. Southside, loc." Ramirez and Perez, who had been standing outside, also began to run.

Jamie saw Rodriguez and Ramirez run up the nearby alley. She did not see where Martinez went after he ran out of the room. Jamie pushed Velasquez, Montenegro and defendant into the vehicle Velasquez had arrived in.

Jamie ran back in the house and came to the front yard. She saw her brother, Perez, and asked him why he was still there. Perez then ran south, towards P Street and Chester.

*Defendant's Arrest and Interview With Police on November 17, 2010*

Defendant was arrested on November 17, 2010. He was read his *Miranda*[12] rights and initially agreed to talk to the police.

Defendant denied committing the murder. He said that "they" asked him to facilitate a meeting between "the Southside and the Varrio."[13] Defendant said "[s]omebody had disrespected somebody and somebody wanted to get, you know, revenge or whatever and I was just there to make sure everything was going to be cool" between the Southside and Varrio. He further explained that "the Varrio boys felt one of the South Side boys disrespected somebody by pulling the gun out on somebody and shooting him but the gun didn't go off. Uh and he felt, you know he wanted to get back at him. But, he wanted to seriously do some damage to this guy and I thought, I was trying to make it, I was trying to get where it's like (unintelligible) you know. No harm done, that's it. Leave it alone fool."

Defendant declined to identify who asked him to set up the meeting. He did say that at the meeting Martinez "was getting too aggressive and somebody, somebody hit

---

[12] *Miranda v. Arizona* (1966) 384 U.S. 436

[13] The officer asked if defendant associated with Varrio, and defendant replied, "Uh, not really … I don't hang around with the Varrio boys."

him." Defendant did not reveal additional details about the incident during the November 17, 2010 interview.

*Defendant's January 2011 Interview with Police*

On January 17, 2011, Sergeant McNeal received a call from the Lerdo pretrial facility indicating that defendant wanted to speak to him. McNeal was unable to get to the facility that day. A sergeant at the pretrial facility called on January 21, 2011, and said defendant had written a letter, attempted suicide, and wished to speak with McNeal. Later that day, McNeal went to the facility and interviewed defendant.

During the interview, defendant told Sergeant McNeal that he had written a suicide note explaining "how everything … went down. The murder." Throughout the interview, when asked about how others were involved, defendant would insist on "just" telling McNeal about his own involvement.

Defendant recounted that "they" passed by in a PT Cruiser and "yelled out their neighborhood." Defendant found that disrespectful so he "flipped them off." Defendant said that "they" wanted to "talk it over," and that is why everyone convened at "the house." Defendant spoke with "one of the guys"[14] and told them, "Look man, if you guys don't have that boy over here by this time, your whole neighborhood is gonna get, I'll put a green light on your whole neighborhood." Defendant also admitted that there was a plan to "discipline" Martinez, and that he was going to "get an ass whipping." Defendant was "going to tell [Bam-Bam's] own homeboys" to hand him the "ass whipping." Defendant was not sure whether the discipline would have occurred at the Meredith address that day.

At the meeting, Martinez was "screaming and hollering and [being] disrespectful." Defendant "tried" to tell Martinez: "You can't be doing that stuff man." Martinez said,

_____

[14] Contextually, defendant is apparently referencing one of the Southside Baker gang members.

13.

"I do what I do." Defendant told him that as a Sureño, there are rules to be followed. Martinez eventually said he was not a Sureño. One of Martinez's friends said, "Hey, hey man you're not a Sureno?" and Martinez responded, "No, no." Defendant said, "You know what, I'm done." Defendant was walking out the door and said, "That's your homeboy, you deal with it." That is when Martinez "came at" defendant. Defendant stabbed Martinez once in the chest.[15] Defendant said he was not taking the blame for someone else and that his explanation was "the God's honest truth."

*Defendant's Jail Call*

The prosecution played a recording of a jail call made by defendant. Defendant told an unidentified male: "I'm going to need someone, like Worm or someone … to say that, that he attacked me." Defendant had the following exchange with the male:

> "[Defendant]: No tell [Worm] that when I was coming out of the room that he attacked me from behind and I defended myself.
>
> "Male: Uh huh.
>
> "[Defendant]: And that's it.
>
> "Male: Okay.
>
> "[Defendant]: Everything else is the same. Everything else is the same."

Defendant said that he left a suicide note, and that Jeanette did not "have to worry about" her son. During the call, defendant told Jeanette to tell Rodriguez to tell the investigator that "that dude attacked me from the back and I defended myself. You know if he wants, if he wants to clean up what he did that day that – to do that."

---

[15] Defendant said he was not trying to stab Martinez in any particular part of his body.

*Defendant's Testimony at Trial*

Defendant testified at trial. He admitted that in May 1994, he was convicted of two felonies relating to possession of methamphetamine for sale while armed with a firearm.

Defendant recounted that on the morning of November 15, 2010, Perez was giving him a ride to someone's house when the car they were in broke down. Defendant was standing on a street corner when he heard someone yell "South" from a PT Cruiser. Defendant "flipped off" the car. The PT Cruiser went down to the end of the street and made a U-turn. As the vehicle approached, defendant walked over to Perez, who was working on the broken down car nearby. It turned out that Perez knew the driver of the vehicle, [16] so they conversed. Defendant saw a passenger, a driver and a male in the backseat with two girls. He had never met any of the vehicle's occupants before.

Defendant and the vehicle's passenger, Martinez, introduced themselves. Everyone shook hands and defendant walked away from the vehicle. Defendant then turned back and told Martinez that he "can't be yelling stuff out like that." Defendant was referencing when Martinez had yelled, "South," as they drove by earlier. Martinez then "got loud" and tried to open the door. He started saying, "What, Loc? What, Loc?" Defendant started to walk towards the vehicle. Martinez then kicked the door open, which hit defendant in the chest. Then Martinez stood up out of the car and pointed a gun at defendant's face. The gun was "not even half an inch" away from defendant's nose. Defendant "just froze" and then heard a "click." Defendant took a "step or two" backwards. Martinez lowered the gun towards defendant's throat and pulled the trigger again, causing defendant to flinch. The gun did not discharge. Martinez got back into the vehicle and left.

---

[16] Defendant later learned the driver was Ramirez.

Ramirez eventually came back in the PT Cruiser, alone. Ramirez tried to apologize for Martinez. Defendant did not accept the apology because Ramirez was not the one who had brandished the gun. Ramirez then left.

Defendant and Perez went to Perez's mother's house, located at 909 Meredith. Montenegro was already at the house. Defendant's "understanding" was that someone from his own group had spoken with Ramirez. They asked that Ramirez help get Martinez to come to the house to apologize. Defendant wanted to resolve the issue because he did not want to see Martinez somewhere in the future without a resolution. Defendant said, "Next time the gun is not going to misfire." Defendant requested that there be no weapons at the meeting.

Defendant was seated on the bed in the back room of the residence at 909 Meredith. Perez and Montenegro were in the room as well. Defendant did not recall whether Velasquez was in the room or outside. Eventually, Martinez, Ramirez, Rodriguez and Dorado came in to the bedroom. Martinez shook defendant's hand and apologized "for what happened." Defendant accepted the apology and told Martinez that there were rules that Sureños needed to follow. Martinez then "got loud" and said he was "going to do it his way" and "that he runs the South Side." Martinez said he was a "South Sider" but not a Sureño. Defendant said, "What do you mean you are not a [S]ureno?" Martinez repeated, "I am not a [S]ureno. I am a South Sider. I am not a [S]ureno." Then Rodriguez asked Martinez, "What do you mean you are not a [S]ureno?" Defendant saw an opportunity to "get out of there" and let Martinez's "own friends deal with it." Defendant then got up to leave and walked past Martinez towards the sliding door. Defendant told Rodriguez, "He is your friend. You deal with it." Defendant saw Martinez "coming right at" him. Defendant opened a three-inch pocket knife, turned, and swung the knife. He had brought the knife because Martinez had tried to kill him earlier in the day. Defendant knew he hit Martinez with the knife, but did not know where. Martinez ran out of the room, as did everyone else. After defendant exited

16.

the room, he never saw Martinez again.  Defendant, Montenegro, Velasquez, and another individual left in a vehicle.

Defendant testified that he had tried to kill himself while in custody.  He told Jeanette that he had not really tried to kill himself because suicide was a sign of weakness.

*Gang Evidence*

Defendant's Tattoos on September 24, 2010

On September 24, 2010, Officer Timothy Diaz interviewed defendant regarding his gang affiliation.  Defendant said he "used to be from the Varrio West Side Shafter criminal street gang."  He had been "jumped into the gang" when he was 10 years old.  Diaz observed several tattoos on defendant, including: the letters "VWS" (an acronym for Varrio West Side) on his chin and left ear; a clown wearing a hat that read "VWS" (again, the acronym for Varrio West Side) on the left side of his neck; the phrase "Southern Comfort" on the back of the neck (representing that he is affiliated with a southern Hispanic gang); the phrase "Death Before Dishonor" on his chest[17]; the letter "S" (for Sureños) and the number "13" (referring to the 13th letter of the alphabet, "M") on his right ear; and an Aztec warrior with a symbol for the number 13 and the word "Sur" on his right leg.

Primary Activities of the Varrio Bakers gang

On May 6, 2010, Officer Diaz "had contact with" Perez.  Perez said the primary activities of the Varrio Bakers included "grand theft auto, robbery, burglaries, firearms possession, assaults with firearms, and drug sales."

---

[17] Defendant told Officer Diaz that death is a consequence of being disrespected.

Gang Expert

Officer Shane Shaff was a member of the Bakersfield Police Department's gang unit from 2006 to 2009. From 2006 to 2010, Officer Shaff received nearly 100 hours of training regarding gangs.

Officer Shaff explained that the larger Sureño gang has several subsets, including the South Side Bakers, Varrio Bakers and "Shafter Varrio West Side, or Shafter." In prison, the "subsets don't matter," and the relevant distinction is between Northerners and Southerners. Outside of prison, however, the difference between subsets can matter. For example, when the Varrio Bakers gang was created, they were rivals to the South Side Bakers even though both subsets are part of the larger Sureño gang.

The primary criminal activities of the Sureño gang include "auto theft, firearms possession, narcotic sales, several shootings," murder and witness intimidation.

Predicate Offenses

Officer Shaff testified to several predicate offenses committed by Sureños, including: a 2007 conviction of a Dorian DeLeon; a 2007 conviction of an Andrew Perez; a 2008 conviction of a Miguel Santiago; and a 2010 conviction of a Ramiro Enriquez.

Officer Shaff also testified as follows:

"[Prosecutor:] Did you also review Case BF137677B, C, and D, involving Luis Montenegro, Vicente Perez, and Adam Velasquez?

"[Ofc. Shaff:] Yes, sir, I did.

"[Prosecutor:] What information did you review?

"[Ofc. Shaff:] Reports. I also spoke with the officers involved in the case, including detectives and officers on the scene.

"[Prosecutor:] In regards to that incident, can you provide the date, a brief factual description?

"[Ofc. Shaff:] Yes, sir. On 11-15 of 2010, Mr. Montenegro, Perez, and Velasquez responded to 909 Meredith here in Bakersfield in regards to –

18.

"[Defense counsel:] I'm sorry, Your Honor. I am going to request an in limine instruction at this time.

"THE COURT: Yes.

"Ladies and gentlemen, as to any of the circumstances that this witnesses relates, the statements made to this witness, the statements made by others to other law enforcement officers cannot be considered by you for the truth of the matter stated. It can only be considered by you to determine the opinion of this witness and his reliance on those statements. You can only accept them for that limited purpose and for no other purpose.[18]

"Mr. Smith.

"[Prosecutor:] Go ahead, Officer Shaff.

"[Ofc. Shaff:] Those subjects responded to 909 Meredith in Bakersfield and for a gang meeting. Also at the gang meeting was Cruz Martinez, who was stabbed and killed during this incident.

"[Prosecutor:] In regards to Mr. Montenegro, what was her ultimately convicted of?

"[Ofc. Shaff:] Penal Code [s]ection 245, subsection (a), subsection (4), and Penal Code [s]ection 186.22, subsection (b), subsection (1), which is the gang enhancement.

"[Prosecutor:] As to Vicente Perez, what was he ultimately convicted of?

---

**18** Later, during trial, the court changed the limiting instruction as follows:

"Ladies and gentlemen … I do want to clarify the limiting instruction I gave to you earlier. [¶] Insofar as what's been described, identified as predicate offenses involving … Luis Montenegro, Vicente Perez, and Adam Velasquez, I indicated to you yesterday that insofar as those offenses are concerned, you can only consider it [*sic*] for the limited purpose of evaluating and determining the reliance this witness places on those offenses. [¶] At this time I am going to broaden that consideration as follows: You can consider those predicate offenses for the truth that those convictions actually occurred, but and insofar as considering it for the truth that they occurred, you can then consider them for the basis and purpose that this witness is relying upon them in reaching a decision. So it is twofold. You can consider them for the truth the conviction actually occurred, as well as for the limited purpose in determining whether a criminal street gang exists. Okay? But you can only consider them for that purpose and for no other."

"[Ofc. Shaff:] Penal Code [s]ection 245, subsection (a), subsection (4), and Penal Code [s]ection 186.22, subsection (b), subsection (1).

"[Prosecutor:] 245. What is the meaning of that code section?

"[Ofc. Shaff:] It's an assault.[19]

"[Prosecutor:] In regards to Adam Velasquez, what was he ultimately convicted of?

"[Ofc. Shaff:] Penal Code [s]ection 245, subsection (a), subsection (4)."

Officer Shaff then testified that he believed Montenegro, Perez, and Velasquez were each members of the Varrio Bakers and Sureño gangs.

The dockets for the three cases were also admitted into evidence. When the prosecution sought to admit the dockets, the court asked defense counsel whether he had any objection. Counsel stated that there was no objection.

The dockets showed that Montenegro, Perez and Velasquez had each pled nolo contendere to assault. The dockets further showed that each of them had been charged with violating section 187, subdivision (a),[20] but those charges were dismissed in the furtherance of justice.

Stipulation

After Officer Shaff's predicate offense testimony outlined above, the prosecution read a stipulation into the record. Defendant and the prosecution stipulated that on November 15, 2010, defendant "actively participated in the Sureno criminal street gang; and … when the defendant participated in the gang, he knew members of the gang engage in or have engaged in the [*sic*] pattern of criminal gang activity."

---

[19] Section 245, subdivision (a)(4), describes assault by means of force likely to produce great bodily injury. (§ 245, subd. (a)(4).)

[20] The court's reading of the information to the jury at the beginning of trial, and the verdict forms ultimately used by the jury, each made clear that section 187, subdivision (a) was the statute defining murder.

20.

Gang Benefit Testimony

Officer Shaff testified that gang members can "lose status" in a variety of ways including "letting the gang or yourself get disrespected without any retaliation or repercussion." He also explained that if Martinez said, "I am not a Sureno," it would have been disrespectful to everyone in the room because "they are all Surenos in that room."

Officer Shaff testified that the stabbing in this case benefitted the Sureño criminal street gang because it showed that "the Surenos are not going to be disrespected as a whole."[21] The crime also would elevate defendant's status as an individual.

## THE TRIAL'S POST-EVIDENCE PHASE

During closing argument, the prosecutor made the following statement:

"The last [theory of liability] is called natural and probable consequence. And what – the theory behind this is if you go to do another offense – in this case it's been alleged there was an assault being set up. If you go there to do that offense and during the commission of that offense somebody kills someone or somebody escalates it, you can be liable."

The court gave the following instructions, among others:

"A person may be guilty of a crime in two ways: One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator who directly committed the crime.

"A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.

"Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime.

[21] Officer Shaff testified in response to a "hypothetical" from the prosecutor which mirrored the prosecution's version of what happened in this case.

21.

"Before you may decide whether the defendant is guilty of murder, you must decide whether he is guilty of assault. To prove that the defendant is guilty of murder, the People must prove that, one, the defendant is guilty of assault; two, during the commission of assault, a coparticipant in that assault committed the crime of murder; and, three, under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the assault.

"A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander."

The court also instructed the jury:

"To decide whether the crime of murder was committed, please refer to the separate instructions that I will give you on that crime.

"The People are alleging that the defendant originally intended to aid and abet assault. If you decide that the defendant aided and abetted the assault and that murder was a natural and probable consequence of that crime, the defendant is guilty of murder."

**DISCUSSION**

## I. THE EVIDENCE OF MONTEGRO'S, PEREZ'S AND VELASQUEZ'S PLEAS SHOULD HAVE BEEN EXCLUDED UNDER EVIDENCE CODE SECTION 352

Defendant contends the court erred in admitting exhibits and expert opinion testimony regarding the guilty pleas entered by Montenegro, Perez and Velasquez. We agree and conclude the judgment must be reversed.

At trial, Officer Shaff testified that Montenegro, Perez and Velasquez[22] were convicted of assault (§ 245, subd. (a)(4)) in connection with the incidents of November 15, 2010. Montenegro and Perez were also found to have committed the assault for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) The dockets for the three cases

---

[22] We will refer to these three individuals as defendant's "confederates."

22.

were also admitted into evidence.  Those dockets contained information regarding defendant's case, including the trial court's *in limine* evidentiary rulings.

## A.  THE LAW

Evidence Code section 352 permits exclusion of evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  "Courts have recognized that evidence of other crimes is extremely inflammatory, and the trial court must take great care to evaluate its admissibility.  [Citation.]  The trial court must find that the evidence has substantial probative value that is not [substantially] outweighed by its potential for undue prejudice.  [Citations.]"  (*People v. Williams* (2009) 170 Cal.App.4th 587, 610.)

We review a trial court's ruling under Evidence Code section 352 for abuse of discretion.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.)  The trial court's discretion is "broad" (*ibid.*) but not "absolute."  (*Brainard v. Cotner* (1976) 59 Cal.App.3d 790, 796.)

## B.  PROBATIVE VALUE

The ultimate purpose of the evidence was to show defendant actively participated in a criminal street gang (§ 186.22, subd. (a)) and committed murder for the benefit of the criminal street gang (§ 186.22, subd. (b)(1)(C).). The evidence had little probative value for this purpose.

The prosecution and defense stipulated that defendant was a member of the Sureño gang.  There was other evidence that Montenegro, Velasquez and Perez were also members of the Sureño gang.  Thus, the prosecution only needed to establish predicate offenses for the Sureño gang.  And the prosecutor was able to do so at trial even without pleas of the confederates.  The prosecutor was able to establish four *other* predicate offenses committed by Sureños *in addition to* the crimes pled to by the confederates.  Therefore, the pleas were ultimately cumulative to the other predicate offense evidence

23.

and therefore had lessened probative value.  (See *People v. Williams*, *supra*, 170 Cal.App.4th at pp. 610–611.)

## C.  SUBSTANTIAL DANGER OF UNDUE PREJUDICE

While the plea evidence was ostensibly offered solely to establish predicate offenses for the Sureño gang, the evidence itself provided much more information to the jury.[23]  The dockets showed that defendant's confederates had each been charged with murder, and that those charges were dismissed in the furtherance of justice.  Thus, the jury learned that four individuals at that fateful "meeting" were charged with murder, and everyone except for defendant had their murder charge dismissed.

All of this information regarding the confederates was presented to the jury by the prosecution without defendant being able to cross-examine the confederates.  In analyzing whether evidence presents a substantial danger of undue prejudice under Evidence Code section 352, courts often consider whether the defendant was able to conduct cross-examination on the issue.  (See *People v. Alexander* (2010) 49 Cal.4th 846, 905 [finding "no likelihood" evidence confused or misled jury because defense "fully explored" limitations of evidence through cross-examination]; *People v. Bell* (2007) 40 Cal.4th 582, 609 [trial court's determination that inability to cross-examine hearsay declarant created strong risk of prejudice under Evidence Code section 352 was not arbitrary or capricious]; *Jones v. City of Los Angeles* (1993) 20 Cal.App.4th 436, 445 [opportunity to cross-examine reduces prejudice].)  Defendant's inability to cross-examine the confederates raises constitutional concerns (see § II, *infra*) and augments the prejudicial effect of the evidence under section 352.

---

[23] The dockets contained entries reflecting *in limine* rulings applicable to *defendant's trial*.  For example, the dockets contained an entry reflecting that the trial court had ruled *in limine* that defendant's "1998 prior conviction cannot be used to impeach" him at trial. Clearly, this information should not have been provided to the jury.

The plea evidence should have been excluded under Evidence Code section 352.

## II. THE ERRONEOUS ADMISSION OF THE PLEA EVIDENCE WAS PREJUDICIAL

Erroneous admission of evidence under Evidence Code section 352 requires reversal if it is reasonably probable the verdict would have been more favorable to the defendant absent the error. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) We cannot conclude the error here was harmless.

At trial, there was no dispute that defendant performed the act that caused Martinez's death. The central issue was whether defendant harbored malice. To show malice, the prosecution emphasized its theory that defendant and his confederates "brought [the victim] there for an ass whooping." [24]

The defense attacked this theory, arguing:

"[The prosecution] had this theory about there was this plan to get [the victim] over to the house to give him an ass whooping, to commit an assault.… [¶] The problem with that is that there hasn't been really any evidence presented – there's been a lot of speculation either by Officer Shaff about who was going to do the ass whoopin'. In order to believe that, other than Officer Shaff, you have to believe what Frankie Jones said, which supposedly came through Playboy."

Later, defense counsel argued:

---

[24] Mid-trial, the trial court summarized the prosecution's theory of the case:

"Insofar as this case is concerned, it's this Court's belief that the People's theory in this case rests upon an agreement between a group of individuals who were to get Mr. Cruz Martinez [Bam-Bam] as well as some of his friends to a particular location to assault Mr. Martinez and by virtue of that, [Playboy's] statements to [Frankie] Jones reaffirmed and echoes that theory. Insofar as that theory is concerned, it's this Court's belief that the theory includes an agreement or conspiracy to commit an assault upon a person and then goes forward in to details about how that person was, in fact, assaulted."

"[I]f there's no assault, then there's no target offense. The only way you can find that there was assault, if you were to believe Frankie Jones or if there were an assault planned."

The defense argument on this crucial issue was severely undermined by the improperly admitted plea evidence. The plea evidence showed that defendant and the three confederates were all charged with murdering Martinez. The plea evidence also showed that the three confederates pled no contest to assaulting Martinez with force likely to cause great bodily injury. This evidence was consistent with the prosecutor's theory that defendant and the confederates *did* bring Martinez to the meeting with the intent to assault him. This, in turn, bolstered the prosecutor's argument that defendant harbored malice when he stabbed Martinez.

Moreover, the plea evidence showed that four people had been charged with murder in connection with Martinez's death (i.e., Montenegro, Velasquez, Perez and defendant). But that evidence also showed each of them had their murder charges dismissed in the furtherance of justice, except for defendant. Without the benefit of cross-examination of the confederates, the jury was left to speculate as to exactly why everyone but defendant had their murder charge dismissed.

We cannot conclude the erroneous admission of evidence in this case was harmless.

## III. THE ADMISSION OF THE PLEA EVIDENCE WAS ALSO LIKELY *CRAWFORD* ERROR

Admitting certain portions of the dockets also likely violated the Confrontation Clause. Testimonial hearsay is inadmissible under the Confrontation Clause unless "the declarant is unavailable, and … the defendant has had a prior opportunity to cross-examine." (*Crawford*, *supra*, 541 U.S. at p. 59, fn. omitted.) The dockets admitted at trial contained entries documenting aspects of the confederates' plea allocutions. It seems clear those portions of the dockets would constitute testimonial hearsay. (See *United States v. Becker* (2d Cir. 2007) 502 F.3d 122, 129–130 [plea allocutions are

testimonial and subject to *Crawford*]; *United States v. McClain* (2d Cir. 2004) 377 F.3d 219, 221–222 [same].)

The Attorney General contends the plea evidence was not offered for its truth. We disagree. Officer Shaff's expert testimony conveying the testimonial hearsay was offered to establish statutorily-required predicate offenses for a gang. (See § 186.22, subd. (e).) To meet these statutory requirements, the prosecution was required to prove "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of" two or more enumerated offenses. (§ 186.22, subd. (e).) In other words, the prosecution needed to prove either the convictions *actually* occurred or the offenses themselves were *actually* committed, attempted, conspired to or solicited. Either way, the plea evidence was necessarily being offered to prove the truth of the matters asserted.

Both parties and the trial court acknowledged this reality that the plea evidence was offered for its truth. The trial court had initially instructed the jury to consider the plea evidence only to determine "the opinion of this witness and his reliance on those statements." But after a mid-trial hearing, the court expanded the instruction as follows:

> "Ladies and gentlemen … I do want to clarify the limiting instruction I gave to you earlier. [¶] Insofar as what's been described, identified as predicate offenses involving … Luis Montenegro [Playboy], Vicente Perez [Worm], and Adam Velasquez [Mumbles], I indicated to you yesterday that insofar as those offenses are concerned, you can only consider it [*sic*] for the limited purpose of evaluating and determining the reliance this witness places on those offenses. [¶] *At this time I am going to broaden that consideration as follows: You can consider those predicate offenses for the truth that those convictions actually occurred, but and insofar as considering it for the truth that they occurred,* you can then consider them for the basis and purpose that this witness is relying upon them in reaching a decision. So it is twofold. *You can consider them for the truth the conviction actually occurred*, as well as for the limited purpose in determining whether a criminal street gang exists. Okay? But you can only consider them for that purpose and for no other." (Italics added.)

As this limiting instruction makes clear, the plea evidence in this case was offered for its truth.

The Attorney General argues the plea evidence was conveyed by an expert to help the jury evaluate his opinion; not to prove the truth of the matters asserted. (See Evid. Code, §§ 801–802.) The Attorney General relies heavily on *People v. Thomas* (2005) 130 Cal.App.4th 1202 (*Thomas*) for this proposition. *Thomas* held:

> "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion. *Crawford* itself states that the confrontation clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' [Citation.]" (*Id*. at p. 1210.)

We agree that *Thomas*'s holding, if applied here, might defeat defendant's *Crawford* claim in this case. However, we conclude that *Thomas* has been impliedly abrogated by *Williams v. Illinois* (2012) 567 U.S. __ [132 S.Ct. 2221] (*Williams*) and *People v. Dungo* (2012) 55 Cal.4th 608. (Cf. *People v. Valadez* (2013) 220 Cal.App.4th 16, 32.)

The core rationale of *Thomas*'s holding is that "the materials on which [an] expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion." (*Thomas*, *supra*, 130 Cal.App.4th at p. 1210.) This reasoning was recently rejected by a majority of justices on the California and United States Supreme Courts.

In *Williams*, five justices agreed that the prosecution could not rely on a witness's status as expert to circumvent the Confrontation Clause's requirements. (*Williams*, *supra*, 132 S.Ct. at .p 2264 (Kagan, J., dissenting).) An opinion signed by four justices explained that "when a witness, expert or otherwise, repeats an out-of-court statement as

the basis for a conclusion … the statement's utility is then dependent on its truth. If the statement is true, then the [expert's opinion] based on it is probably true; if not, not. So to determine the validity of the [expert's opinion], the factfinder must assess the truth of the out-of-court statement on which it relies." (*Id*. at pp. 2268-2269 (Kagan, J., dissenting).) In a separate opinion, a fifth justice similarly concluded: "There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth…." (*Id*. at p. 2257 (Thomas, J., concurring).)

Similarly, in *People v. Dungo*, *supra*, 55 Cal.4th 608, a majority of Supreme Court justices concluded that the hearsay evidence used to support an expert's opinion in that case was introduced for its truth. (See *id.* at p. 627 (Werdegar, J., concurring).) Two additional justices dissented, concluding that the Confrontation Clause was violated even though an expert had conveyed the testimonial hearsay. (*Id.* at p. 634 (Corrigan, J., dissenting).) Thus, *Thomas*'s categorical holding has been effectively overruled.[25]

Both *Williams* and *Dungo* are diametrically opposed to *Thomas*'s reasoning that "the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion." (*Thomas*, *supra*, 130 Cal.App.4th at p. 1210.)

The Attorney General's reliance on *Thomas* is misplaced.[26]

[25] The Supreme Court may address *Thomas* explicitly soon. (See *People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014, S216681.) In the meantime, it is sufficient to note that a majority of justices on the United States and California Supreme Courts have necessarily rejected the notion that out-of-court statements conveyed by an expert are never offered for their truth.

[26] However, given our conclusion regarding Evidence Code section 352, we need not conclusively determine whether the admission of the plea evidence violated the Confrontation Clause.

**IV.NATURAL AND PROBABLE CONSEQUENCES DOCTRINE**

Defendant also contends the court erred in instructing the jury on the natural and probable consequences doctrine. While this issue is not dispositive in light of our conclusion that prejudicial evidentiary error occurred, we will explore the issue to provide guidance on remand. (See Code Civ. Proc., § 43. Cf. *People v. Ross* (2007) 155 Cal.App.4th 1033, 1049.) Ultimately, we conclude the natural and probable consequences instruction should not have been given.

**THE LAW**

"There are two distinct forms of culpability for aiders and abettors. 'First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." ' [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 158.) We will refer to the first form of culpability as "direct" aider and abettor liability. We will refer to culpability under the natural and probable consequences doctrine as "indirect" aider and abettor liability.[27]

*1. Direct Aider and Abettor Liability*

An individual who merely assists or encourages the crime is treated as a principal if he or she was "concerned in the commission of the crime." (§ 31.) 'Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts.' [Citation.]" (*People v. Maciel* (2013) 57 Cal.4th 482, 518.) But, to establish direct aider and abettor liability, the prosecution must prove the aider and abettor acted with the intent of encouraging, facilitating or committing the offense.

---

[27] See *People v. Chiu*, *supra*, 59 Cal.4th at p. 158 [contrasting natural and probable consequences form of aider and abettor liability with "direct" aiding and abetting principles.]; see also *id*. at p. 171 (Kennard, J., conc. & dis. opn.) [referring to liability under the natural and probable consequences rule as "indirect" liability].

(*People v. Beeman* (1984) 35 Cal.3d 547, 560.) Under direct aider and abettor liability, the crime ultimately committed by the perpetrator was intended by the aider and abettor.

### 2. *Indirect Aider and Abettor Liability Under the Natural and Probable Consequences Doctrine*

Other times, "an accomplice assists or encourages a confederate to commit one crime [(i.e., the target offense)], and the confederate commits another, more serious crime ([i.e.,] the nontarget offense)." (*People v. Prettyman* (1996) 14 Cal.4th 248, 259 (*Prettyman*).) In that situation, the aider and abettor "is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime." (*People v. Favor* (2012) 54 Cal.4th 868, 874.) This principle is called the "natural and probable consequences doctrine" or "indirect" aider and abettor liability. (See *People v. Chiu*, *supra*, 59 Cal.4th at pp. 171–172 (Kennard, J., conc. & dis. opn.).)

### 3. *Aider and Abettor's Intent*

The difference between direct and indirect accomplice liability centers around the aider and abettor's intent.

To establish direct accomplice liability, it must be shown that the accomplice intended to encourage, facilitate or commit the specific crime committed by the perpetrator. (See *Prettyman*, *supra*, 14 Cal.4th at p. 262; accord *People v. Torres* (1990) 224 Cal.App.3d 763, 769.)

To establish indirect liability, it still must be shown that the aider and abettor intended to facilitate the target offense. (See *People v. Gonzales* (2001) 87 Cal.App.4th 1, 15.) But the prosecution need not prove the aider and abettor intended to facilitate the nontarget offense. (*Prettyman*, *supra*, 14 Cal.4th at p. 261; accord *People v. Torres*, *supra*, 224 Cal.App.3d at pp. 769–770.) Thus, under the natural and probable causes doctrine, "an aider and abettor may be liable for a [nontarget] crime he did not

31.

intend .…" (*People v. Woods* (1992) 8 Cal.App.4th 1570, 1602 (Sparks, Acting P.J., concurring).)

### A. THE COURT ERRED IN INSTRUCTING THE JURY ON THE NATURAL AND PROBABLE CONSEQUENCES DOCTRINE

In the instant case, one of the prosecution's theories was that defendant intended to aid and abet assault (the target offense), and was therefore guilty of the murder (the nontarget offense) that occurred as a natural and probable consequence of the assault. The court instructed the jury accordingly. (See CALCRIM No. 403.)

Defendant argues he was "the direct perpetrator of the homicide, the non-target offense," and therefore the natural and probable consequences theory does not apply. We agree. We are aware of no case where the natural and probable consequences doctrine has been applied to a sole perpetrator of a nontarget offense. We decline to extend the doctrine to such circumstances.

First, we note that when the sole defendant is the perpetrator of the nontarget offense, the elements of the natural and probable consequences doctrine are inapt.[28] One element required to invoke the doctrine is that "the defendant's *confederate* committed an offense other than the target crime." (*Prettyman*, *supra*, 14 Cal.4th at p. 262, italics added, some italics omitted, fn. omitted.) Here, the "offense other than the target crime" was murder. And the only alleged perpetrator of the murder was defendant, not any of his confederates. Thus, one of the doctrine's elements lacks supporting evidence.

Second, and perhaps more importantly, applying the doctrine to perpetrators of a nontarget offense would completely negate any intent or malice requirements of that

---

[28] The poor fit between the doctrine's elements and the facts of this case is unsurprising, because "culpability under the natural and probable consequences doctrine is *vicarious*.…" (*People v. Chiu*, *supra*, 59 Cal.4th at p. 164, italics added.) When the defendant is the *perpetrator* of the nontarget offense, his liability for that crime is, by definition, not vicarious.

32.

offense. Admittedly, it is well established that the doctrine *does* vitiate any requirement that the *aider and abettor* intend for the nontarget offense to occur. (*Prettyman*, *supra*, 14 Cal.4th at p. 261 [the "aider and abettor need not have intended to encourage or facilitate" the nontarget offense].) But extending the doctrine to the perpetrator of a nontarget offense would eliminate the need to prove that *anyone* intended for the nontarget offense to be committed. Such an expansion would contravene the requirement that "[t]he actual perpetrator must have whatever mental state is required for each crime charged .…" (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1123.)

Because the doctrine does not apply to the facts of this case, it was error for the court to instruct the jury on the doctrine.

The Attorney General urges a different result, relying almost entirely on *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*). Defendant seeks to distinguish that case on the basis that *Olguin* "involved multiple defendants rather than a single person on trial." We agree *Olguin* is distinguishable, but not for the reason cited by defendant.

In *Olguin*, defendant Mora argued that because he was the perpetrator of the target offense (i.e., a preshooting assault), he could not be liable for a resultant nontarget offense (i.e., a murder) committed by his confederate. (*Olguin*, *supra*, 31 Cal.App.4th at pp. 1375–1376.) The *Olguin* court rejected Mora's argument. We agree that the applicability of the natural and probable consequences doctrine does not depend on whether the defendant was the perpetrator or the aider and abettor of the *target* offense. Because even though defendant Mora was the perpetrator of the target offense, his liability for the nontarget offense was vicarious. Thus, as to defendant Mora, it was appropriate to instruct on a vicarious theory of liability with respect to the nontarget offense. But here we face a different question. Is the doctrine's applicability affected by the nature of defendant's involvement in the *nontarget* offense? When, as here, the defendant *perpetrates* the nontarget offense, his liability for that offense is not vicarious. As a result, the prosecution was required to prove defendant had the mental state required

for murder.  (See *People v. Mendoza*, *supra*, 18 Cal.4th at p. 1123 ["the actual perpetrator must have whatever mental state is required for each crime charged"].)

In sum, the natural and probable consequences doctrine did not apply to this case because the only perpetrator of the nontarget offense was the sole defendant being tried. It was error to instruct the jury on the doctrine.

## DISPOSITION

The judgment is reversed.  The matter is remanded to the trial court for possible retrial.

_____
Poochigian, J.

WE CONCUR:

_____
Cornell, Acting P.J.

_____
Gomes, J.